**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

EDWARD MULE and MARIAN MULE,

Plaintiffs,

-against-

3-D BUILDING AND CONSTRUCTION
MANAGEMENT CORP., JOSEPH DUNN,
MICHAEL DUNN, DUNN DEVELOPMENT &
CONSTRUCTION CORP., 121 MAPLE AVENUE,
LLC, 139 ROYAL AVENUE, LLC, 356
BROOKHAVEN AVENUE, LLC, 21 ASPEN
ROAD, LLC, and 31 FANNING ROAD, LLC.

Defendants.
-------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

CV 18-1997 (JS) (AKT)

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.    PRELIMINARY STATEMENT

Plaintiffs Edward Mule and Marian Mule (collectively, "Plaintiffs") commenced this

action against individual Defendants Joseph Dunn and Michael Dunn (the "Dunns") and

corporate Defendants 3-D Building and Construction Management Corp. ("3-D Mgt."), Dunn

Development & Construction Corp. ("Dunn Development"), 121 Maple Avenue, LLC ("121

Maple"), 139 Royal Avenue, LLC ("139 Royal"), 356 Brookhaven Avenue, LLC ("356

Brookhaven"), 21 Aspen Road, LLC ("21 Aspen"), and 31 Fanning Road, LLC ("31 Fanning")

(collectively, "Defendants") alleging fraudulent conveyances under New York Debtor &

Creditor Law ("NYDCL") §§ 273, 274, 275 as well as theories of alter ego/ corporate veil

piercing and successor liability. *See generally* Complaint ("Compl.") [DE 1]. Plaintiffs seek to

hold Defendants liable for a monetary judgment entered against 3-D Mgt., in the amount of

$502,985.86, plus interest ("Judgment"). *Id.* Plaintiffs assert that the Dunns engaged in a

scheme to undercapitalize and subsequently dissolve 3-D Mgt. by systematically stripping 3-D Mgt. of its assets in favor of the Dunns and other related entities owned and controlled by the Dunns in order to avoid paying the Judgment. *Id*.

Plaintiffs filed a motion for sanctions against Defendants for spoliation of tangible and electronic evidence, pursuant to Rule 37(e) of the Federal Rules of Civil Procedure. *See* Plaintiffs' Memorandum of Law in Support of Motion for Sanctions ("Pls.' Mem.") [DE 63]; Plaintiffs' Reply Memorandum of Law in Support of Motion for Sanctions ("Pls.' Reply") [DE 69]. Plaintiffs requested that the Court enter default judgment against Defendants. Pls.' Mem. at 6. In the alternative, Plaintiffs requested that: (1) the jury be given an adverse inference at trial; (2) certain alleged facts be deemed admitted; (3) evidence concerning the subject matter of the spoliated material be precluded; or (4) monetary sanctions be imposed. *Id*. Defendants oppose the motion. *See* Defendants' Memorandum in Opposition to Motion for Sanctions ("Defs.' Opp'n") [DE 68].

On October 30, 2020, this Court entered a short-form Order, GRANTING, in part, and DENYING, in part, Plaintiffs' motion for sanctions. *See* DE 84. In that Order, the Court stated that the substantive written decision would follow. This Memorandum and Order constitutes the substantive written decision.

## II.   RELEVANT BACKGROUND

### A.   Allegations

The Court's summary of the relevant facts is taken from the Complaint and is for purposes of this motion only. 3-D Mgt. was engaged in high-end home renovations and new home constructions. *See* Compl. ¶ 2. 3-D Mgt. was owned, operated, and controlled by the Dunns. *Id*. The Dunns also owned, operated, and controlled the properties named here as 121

Maple, 139 Royal, 356 Brookhaven, 21 Aspen, and 31 Fanning (collectively, the "LLC Defendants"). *Id*. ¶¶ 6-10.

In 2013, Plaintiffs notified 3-D Mgt. of water infiltration issues at Plaintiff's home (the "Property") which had been constructed by 3-D Mgt. *Id*. ¶¶ 16-17. On January 3, 2014, Plaintiffs sent 3-D Mgt. a formal notice of their intention to hold 3-D Mgt. liable for all damages incurred at the Property. *Id*. ¶ 18. Plaintiffs filed a demand for arbitration against 3-D Mgt. on June 30, 2014 which alleged that 3-D Mgt. breached the parties' contract by performing faulty and defective work at the Property. *Id*. ¶¶ 19-20. 3-D Mgt. did not defend the arbitration. *Id*. ¶ 21. Instead, shortly after the arbitration demand was filed, the Dunns began dissolving 3-D Mgt. and formed a new entity referred to as Dunn Development on September 11, 2014. *Id*. ¶¶ 22-23, 26-34. Concurrently with the formation of Dunn Development, 3-D Mgt. ceased its business operations, closed its financial accounts, and transferred its assets, customer lists, ongoing projections and good will to Dunn Development. *Id*. ¶ 26. Dunn Development maintained the same management, personnel, and physical location as 3-D Mgt., *id*. ¶¶ 44-45, 47-51, 59, and engaged in a business which was substantially similar, if not identical, to 3-D Mgt. *Id*. ¶ 25.

On March 13, 2016, 3-D Mgt. was formally dissolved. *Id*. ¶¶ 33-34. Plaintiffs obtained an arbitration award against 3-D Mgt. on September 9, 2016, after which they filed a petition to confirm the arbitration award. *Id*. ¶ 37. Consequently, on February 21, 2017, Plaintiffs obtained a judgment against 3-D Mgt. in the amount $509,850.29, plus interest at a rate of 9% per annum ("Judgment"), which remains wholly unsatisfied and outstanding to date. *Id*. ¶¶ 37-40.

According to Plaintiffs, over a period of several years, the Dunns dominated and controlled 3-D Mgt. in a manner detrimental to Plaintiffs by rendering 3-D Mgt. unable to satisfy

the Judgment. *Id*. ¶ 41. Plaintiff alleges that 3-D Mgt. failed to retain sufficient earnings required to meet its obligations and was undercapitalized as a result of the Dunns' systematic stripping of 3-D Mgt.'s assets in favor of themselves and related entities owned and controlled by them, without consideration and without observing corporate formalities. *Id*. ¶¶ 41, 66. Specifically, Plaintiffs allege several instances in which 3-D Mgt. transferred hundreds of thousands of dollars to related non-party entities owned and controlled by the Dunns as "investments" or "loans," without any consideration. *Id*. ¶¶ 70-85. Plaintiffs assert that the funds transferred to these related entities and, in some instances, the profits derived from the transferred funds, were subsequently distributed to the Dunns personally or to other entities that the Dunns owned and controlled. *Id*. ¶¶ 75, 80-81. Thereafter, the Dunns dissolved these related non-party entities which allegedly never repaid 3-D Mgt. the transferred funds. *Id*. ¶¶ 74, 81, 84. Plaintiffs allege a similar scheme with respect to the LLC Defendants, in which 3-D Mgt.'s funds were directly (1) used for or transferred to the LLC Defendants for the purchase of several real properties held in title by the LLC Defendants, and (2) used for the payment of the property taxes and mortgages for those properties, without fair consideration. *Id*. ¶¶ 97-138. Lastly, Plaintiffs contend that the Dunns "persistently" used 3-D Mgt.'s funds to pay for their various personal expenses. *Id*. ¶ 68.

According to Plaintiffs, these transactions constitute fraudulent conveyances, *id*. ¶¶ 142-160, for which the Dunns and corporate Defendants are liable -- under theories of alter ego/corporate veil piercing and successor liability -- in the amount of the Judgment. *Id*. ¶¶ 13-141.

**B.      Procedural History**

On April 3, 2018, Plaintiff commenced the instant action against Defendants. *See generally* Compl. Thereafter, discovery commenced and motion practice ensued. On November 5, 2018, Plaintiffs filed a motion to compel responses to discovery demands contending, among other things, that Defendants neither provided adequate responses or objections to the demands nor produced any documents responsive to the demands. *See* DE 36. The discovery demands at issue predominantly sought Defendants' financial and business information and records relevant to Plaintiffs' alter ego/corporate veil piercing and successor liability claims. *Id*. After holding a hearing on the motion, the Court found that Defendants' objections and responses were facially improper and/or deficient, as a result of which the Court granted Plaintiffs' motion to compel. *See* December 18, 2018 Civil Conference Minute Order ("CCMO") [DE 40]. To the extent that Defendants failed to supplement their responses by the date provided, they were cautioned that a fine would be imposed. *Id*.

On April 24, 2019, Plaintiffs filed a second motion to compel Defendants' responses to discovery demands contending, among other things, that Defendants' supplemental responses remained deficient and that responsive documents were not produced. *See* DE 43. The requests at issue again predominantly sought Defendants' financial and business information and records. *Id*. On June 11, 2019, the Court held a hearing on Plaintiffs' second motion to compel, at which time the Court noted that Defendants did not fully and substantively comply with the directives given at the prior discovery hearing. *See* June 11, 2019 CCMO [DE 46]. Ultimately, the Court imposed sanctions in the amount of $1,000 against Defendants and their counsel. *Id.* at 6. In doing so, the Court stated the following: "the fact that Plaintiffs' counsel had to resort to this type of discovery application because of Defendants' continued failures to comply with their

discovery obligations is both unacceptable and sanctionable conduct under Rule 37.  Moreover, Defendants were cautioned about such actions at the December 2018 Conference."  *Id*. at 5-6. Plaintiffs' counsel also advised the Court at the June 11, 2019 hearing that during the deposition of Michael Dunn, Plaintiffs discovered that evidence had been destroyed.  *Id*. at 1.  To the extent counsel had support for such a claim, the Court stated that a motion for spoliation could be filed. *Id*.

Thereafter, Plaintiffs filed a third motion to compel responses to discovery demands on September 19, 2019, for which a hearing was then scheduled by the Court.  *See* DE 53, 57-59; September 16, 2019 Electronic Order.  Based on the representation that Defendants' efforts to produce responsive documents was ongoing, the Court cancelled the discovery hearing and directed the parties to advise the Court by October 14, 2019 if any discovery disputes remained. *See* October 11, 2020 Electronic Order.  Plaintiffs did not renew their motion, but instead filed the instant fully briefed motion on January 17, 2020 seeking sanctions for spoliation of tangible and electronic evidence.  *See* Pls.' Mem.; Defs.' Opp'n; Pls.' Reply.  In support of the motion, Plaintiffs submitted the Declaration of Todd R. Regan, Esq. and the Supplemental Declaration of Todd R. Regan, Esq., both of which attach several exhibits relied upon to support the instant motion.  *See* Declaration of Todd R. Regan, Esq. ("Regan Decl.") [DE 64]; Supplemental Declaration of Todd R. Regan, Esq. ("Regan Suppl. Decl.") [DE 65].  In support of its opposition to the motion, Defendants filed the Declaration of Michael Dunn and the Declaration of Robert E. Merrihew, Esq.[1]  *See* Declaration of Michael Dunn in Opposition to Motion for Sanctions ("Dunn Decl.") [DE 67]; Declaration of Robert E. Merrihew, Esq. ("Merrihew Decl.") [DE 66].

---

[1]    Plaintiffs request that the Court strike the Declaration of Merrihew because Attorney Merrihew inappropriately attests to factual matter for which he lacks personal

### III.   THE PARTIES' CONTENTIONS

Plaintiffs filed the instant spoliation motion asserting that Defendants intentionally and/or in a grossly negligent manner destroyed tangible and electronic evidence which they had an obligation to preserve. Pls.' Mem. at 6. Plaintiffs contend that Defendants' obligation to preserve arose as early as 2013, when Plaintiffs notified 3-D Mgt. of the workmanship and water infiltration issues with the Property, and as late as June 30, 2014, when Plaintiffs filed their arbitration demand. *Id*. at 16-17. According to Plaintiffs, in 2015, while arbitration was pending, Michael Dunn discarded both 3-D Mgt.'s physical files and electronic QuickBooks files. *Id*. at 10-11. 3-D Mgt.'s physical files were stored in boxes kept on the floor of its office. *Id*. In July 2015, these files sustained water damage as result of a flood caused by a leaky toilet in 3-D Mgt.'s office and, ultimately, were discarded by Michael Dunn. *Id*. at 10. Plaintiffs contend that these physical files contained business records including, but not limited to, receipts from vendors, credit card receipts, and statements from suppliers. Pls.' Reply at 11.

Later that year, Michael Dunn had the hard drive to 3-D Mgt.'s office computer replaced because it "was compromised." Pls.' Mem. at 11. This hard drive stored the QuickBooks files which contained the corporate Defendants' financial information and data, including the data and financial information for 3-D Mgt. *Id*. Prior to replacing the hard drive, Michael Dunn backed up the QuickBooks files for all of the corporate Defendants, with the exception of 3-D Mgt. *Id*. Plaintiffs contend that the financial data contained in the QuickBooks files included, among other things, business expenses, customer invoices, checks issued by 3-D Mgt., payments received by 3-D Mgt., loans provided to 3-D Mgt. from the Dunns, and data from which all of 3-

---

knowledge. Pls.' Reply at 6. The Court limits its consideration of the Declaration of Merrihew to matters for which he adequately demonstrates personal knowledge.

D Mgt.'s payroll and yearly tax filings were prepared. *Id*. at 11, 13. Plaintiffs contend that Michael Dunn maintained the only electronic version of 3-D Mgt.'s QuickBooks files and did not provide 3-D Mgt.'s bookkeeper or accountant with these electronic files. *Id*. at 11-12. Instead, Michael Dunn provided 3-D Mgt.'s bookkeeper, Ellen Dunn, with hard copy printouts of information required to prepare 3-D Mgt.'s tax returns. *Id*. at 11. 3-D Mgt.'s bookkeeper would in turn transmit this information to 3-D Mgt.'s accountant, Roy Little. *Id*. Although Plaintiffs obtained a version of the QuickBooks files from 3-D Mgt.'s accountant, Plaintiffs contend that there are discrepancies between the QuickBooks files maintained and ultimately discarded by 3-D Mgt. and those of the accountant. *Id*. at 14. For instance, Plaintiffs argue that the QuickBooks files obtained from 3-D Mgt.'s accountant mischaracterized numerous personal expenses as legitimate business expenses. *Id*. Michael Dunn testified that he correctly listed all personal expenses as "MD Expenses" in 3-D Mgt.'s QuickBooks file, but that 3-D Mgt.'s bookkeeper or accountant must have changed these entries in QuickBooks to materials or office expenses. *Id*.

As a result of Defendants' failure to preserve 3-D Mgt.'s electronic QuickBooks files and physical files, Plaintiffs contend that the "majority of 3-D [Building's] business records have been destroyed," *id*. at 12, resulting in both "evidentiary and economic prejudice" to Plaintiffs. *Id*. at 25-26. As to 3-D Mgt.'s physical files, Plaintiffs concede that they have no way of knowing "precisely what information was contained in the spoliated records" but assert that relevance may be inferred where, as here, the destruction of evidence was intentional or, at a minimum, grossly negligent. *Id*. at 24. Nonetheless, Plaintiffs maintain that they suffered evidentiary prejudice and economic prejudice in having to piece together information obtained through subpoenas. *Id*. at 25-26. As a result of Defendants' spoliation, Plaintiffs request that the

Court enter default judgment against the Defendants or, in the alternative, direct that the jury be given an adverse inference at trial, deem certain alleged facts admitted, preclude the introduction of evidence concerning the subject matter of the spoliated evidence, or impose monetary sanctions. *Id.* at 6.

In opposition to the instant motion, Defendants argue that Plaintiffs have not sufficiently demonstrated what relevant information was destroyed. Defs.' Opp'n at 7. Defendants further assert that no information was lost or destroyed because the contents of the physical files and QuickBooks files were stored on 3-D Mgt.'s office computer and ultimately were produced to its bookkeeper and accountant. *Id*. at 7. In support of this contention, Defendants submitted the Declaration of Michael Dunn who attests that it "had been [his] practice to input information into the QuickBooks program on the office computer relating to all of the Defendants and then drop[] the paperwork into separate boxes on the floor relating to a particular entity." *See* Dunn Decl. ¶ 8. It was also his "practice to deliver by hand at the end of each month all of the material that had been inputted into the office computer to [3-D Mgt.'s] bookkeeper." *Id*. ¶ 13. The "data" inputted for any "entities" on the office computer "was delivered to the bookkeeper, who would thereafter give it to the accountant." *Id*. ¶ 16. As a result, Defendants maintain that all relevant information and records have been produced to Plaintiffs in one form or another from 3-D Mgt.'s bookkeeper and accountant. Defs.' Opp'n at 6-8. Finally, because the contents of the physical files were stored on the computer and this information, along with the QuickBooks data, was always produced to 3-D Mgt.'s bookkeeper and accountant, Defendants contend that they have no culpability and that the information was not "lost." *Id*. at 8. Defendants characterize the flood in 3-D Mgt.'s office as an "event beyond [Defendants'] control" for which they should not be held culpable. *Id*. at 6.

In their reply, Plaintiffs argue that the Defendants seek to impose an unreasonably high burden on Plaintiffs with respect to establishing both the intentional nature of the destruction of evidence and the resulting prejudice. Pls.' Reply at 4. Plaintiffs also assert that the factual circumstances leading up to Michael Dunn's decision to discard the hard drive, including the prior destruction of 3-D Mgt.'s physical files in a "fortuitous" flood, provide a compelling basis for inferring that these acts were done intentionally to deprive Plaintiffs of the use of the information. *Id.* Consequently, according to Plaintiffs, they are not required to make a further showing of prejudice. *Id.* ¶ 4-6. Plaintiffs also dispute Defendants' claim that the "data" or "information" was backed up and provided to 3-D Mgt.'s bookkeeper and accountant. *Id.* at 7-10.

Plaintiffs contend Michael Dunn's deposition testimony reveals that the only information provided to 3-D Mgt.'s bookkeeper were "print[ed] checks" for the weekly or monthly invoices that had been paid through QuickBooks. *Id.* at 8. Plaintiffs maintain that neither the bookkeeper nor the accountant were ever provided with 3-D Mgt.'s electronic QuickBooks files or data. *Id.* Moreover, because Michael Dunn testified that he "didn't check to see what … the contents [of the damaged boxes] were" prior to discarding them, Plaintiffs dispute that all of the relevant "data" or "information" was stored in the computer and thereafter produced to the bookkeeper or accountant. *Id.* at 11. Nonetheless, in response to Plaintiffs' discovery demands, 3-D Mgt.'s bookkeeper advised that she discarded any hard copy or electronic business records related to 3-Building sometime in January 2018. *Id.* at 9. And, although Plaintiffs received a version of 3-D Mgt.'s QuickBooks files from its accountant, they contend that this version lacks much of the information contained in the original QuickBooks file. *Id.* at 11-14.

## IV.  LEGAL STANDARD

### A.  Authority of this Court

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, "[p]retrial matters 'not dispositive of a party's claim or defense' may be referred to a magistrate judge for hearing and decision, subject to review, if timely objections are filed, on a 'clearly erroneous' or 'contrary to law' standard." *Seena Int'l, Inc. v. One Step Up, Ltd.*, No. 15-CV-1095, 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016) (quoting Fed. R. Civ. P. 72(a)); *see also Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*, No. 15-CV-3533, 2017 WL 2840279, at *8 (S.D.N.Y. June 27, 2017). "Discovery motions, including those seeking sanctions, ... are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction deployed disposes of a claim.'" *Id.* at *10 (quoting *Lan v. Time Warner, Inc.*, No. 11-CV-2870, 2016 WL 928731, at *1 (S.D.N.Y. Feb. 9, 2016)). The "critical issue" in determining whether a discovery motion falls under Rule 72(a) "is what sanction the magistrate judge actually imposes" rather than the sanctions sought by the moving party. *Id.* (internal quotation marks and citation omitted).

Although Plaintiffs here seek case-dispositive sanctions -- a default judgment -- the discovery sanctions that this Court finds appropriate would not "'fully dispose of a claim or defense,'" as discussed below. *Id.* (quoting *Oracle USA, Inc. v. SAP AG*, 264 F.R.D. 541, 546 (N.D. Cal. 2009)). Accordingly, because this case has been referred to this Court for general pre-trial supervision, it is appropriate for Plaintiffs' motion for sanctions to be resolved by this Court in the first instance.

### B.  Spoliation

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20-CV-0706, 2021 WL 2201382, at *2 (S.D.N.Y. June 1, 2021) (citing *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 148 (2d Cir. 2008)).  Historically, a party seeking sanctions for spoliation had to demonstrate:  "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v.  Port Auth. of New York and New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (citing *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir. 2002)); *Coale v. Metro-N. Commuter R. Co.*, 621 Fed. App'x. 13, 16 (2d Cir. 2015) (citation omitted).  "This general rule applied to the destruction of both tangible and electronic evidence until December 1, 2015, at which time Rule 37(e) of the Federal Rules of Civil Procedure was amended to provide a different standard for the destruction of ESI." *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 425 (W.D.N.Y. 2017). Therefore, "as the law currently exists in the Second Circuit, there are separate legal analyses governing the spoliation of tangible evidence versus electronic evidence." *Best Payphones, Inc. v. City of New York*, No. 01-CV-3924, 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016), *aff'd as modified sub nom. Best Payphones, Inc. v. Dobrin*, 409 F. Supp. 3d 130 (E.D.N.Y. 2018).

Rule 37(e) now provides as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > (A) presume that the lost information was unfavorable to the party;
> > >
> > > (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). This new rule "rejects cases such as *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99 (2d Cir. 2002), that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence." *McIntosh v. United States*, No. 14-CV-7889, 2016 WL 1274585, at *31 (S.D.N.Y. Mar. 31, 2016) (internal quotation omitted). "The amended Rule 37(e) makes it more difficult for a moving party to obtain sanctions for spoliation of ESI requiring, at minimum, that the court find prejudice, and, in order to impose more extreme sanctions, that it find an intent to deprive." *Lokai Holdings, LLC v. Twin Tiger USA LLC,* No. 15-CV-9363, 2018 WL 1512055, at *8 (S.D.N.Y. Mar. 12, 2018). "Whereas the previous version of Rule 37 permitted severe sanctions for negligent spoliation, pursuant to amended Rule 37(e), the movant must now show that the non-moving party 'acted with the intent to deprive [the movant] of the information's use in the litigation' before the sanctions listed in subsection (2) of Rule 37(e) -- *i.e.*, adverse inference, dismissal, or default judgment -- are available." *Fashion Exch. LLC v. Hybrid Promotions, LLC*, No. 14-CV-1254,

2019 WL 6838672, at *3 (S.D.N.Y. Dec. 16, 2019) (quoting Fed. R. Civ. P. 37(e)(2)); *see also Lokai Holdings*, 2018 WL 1512055, at *8; *Leidig v. Buzzfeed, Inc.,* No. 16-CV-0542, 2017 WL 6512353, at *7 (S.D.N.Y. Dec. 19, 2017).  Absent a showing of "intent to deprive," the moving party's relief is limited to sanctions under subsection (1) of Rule 37(e) -- *i.e.*, monetary sanctions, forbidding the party that failed to preserve information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument. *See Lokai Holdings*, 2018 WL 1512055, at *8 (citing Fed. R. Civ. P. 37(e)(1) Advisory Committee Note, 2015 Amendment).  A Rule 37(e)(1) sanction may only be imposed upon a finding of "prejudice" from the loss of the information, and the sanction imposed may be "no greater than necessary to cure the prejudice." *Id.*

"In addition to any other sanctions expressly contemplated by Rule 37(e), as amended, a court has the discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to address any prejudice caused by the spoliation." *Id.* (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 499 (S.D.N.Y. 2016)).  Ultimately, "[t]he decision of what type of sanction is appropriate in a given case is left to the sound discretion of the district court." *Tchatat v. O'Hara*, No. 14-CV-2385, 2017 WL 1379097, at *4 (S.D.N.Y. Apr. 14, 2017) (collecting cases).

## V.   DISCUSSION

### A.   Preliminary Issue

As an initial matter, Plaintiffs appear to be seeking sanctions against each corporate Defendant as well as each individual Defendant for the spoliation of evidence.  However, the alleged wrongdoing giving rise to the instant motion results from the conduct of 3-D Mgt. acting

through its officers and directors. "Unless a litigant had control over the relevant documents or the nonparty, the contention of spoliation is dubious." *Wandering Dago Inc. v. New York State Office of Gen. Servs.*, No. 13-CV-1053, 2015 WL 3453321, at *7 (N.D.N.Y. May 29, 2015); *see also Grant v. Salius,* No. 09-CV-0021, 2011 WL 5826041, *3 (D. Conn. Nov.18, 2011) ("[W]here the party against whom sanctions are sought has not been shown to have had any responsibilities related to the maintenance, preservation or destruction of the evidence at issue, and the loss of that evidence is instead attributable to non-parties ..., [the plaintiff] has failed to show that [d]efendants ... had any role with respect to the maintenance or participated in the destruction[.]"). As such, the only corporate Defendant for whom the Court will consider imposing sanctions here is 3-D Mgt.

To the extent that Plaintiffs seek to impose sanctions on the Dunns in their individual capacities, the Court would be required to disregard 3-D Mgt.'s corporate form and "pierce the corporate veil," thus enabling individual liability on the part of Defendants for the alleged wrongful acts engaged in by the corporation itself. *See, e.g.*, *Am. Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997). Under New York law,[2] to pierce the corporate veil a party must show: "(i) that the owner exercised complete domination over the corporation with

_____

[2]    Since 3-D Mgt. is a New York corporation, *see* Compl. ¶ 2, and the majority of the acts giving rise to the Complaint occurred within New York, New York law governs any veil-piercing analysis. *See Hectronic GmbH v. Hectronic USA Corp.*, No. 20-CV-2964, 2020 WL 6947684, at *9 (S.D.N.Y. Nov. 24, 2020) (citing *Kalb, Voorhis & Co. v. Am. Fin. Corp.,* 8 F.3d 130, 132–33 (2d Cir. 1993) (("The law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders...."); *In re Adler, Coleman Clearing Corp.,* 205 Fed. App'x 856, 858 (2d Cir. 2006) (approving the application of New York law to pierce the corporate veil where corporation operated in New York and majority of the fraudulent activity occurred within New York). The Court also notes that the issue of veil-piercing/alter-ego is the subject of the claims pleaded in the Complaint and is thus an ultimate issue in the case on the merits. As such, the findings made here are merely for purposes of the instant motion and do not constitute resolution of the merits of the claims.

respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Liberty Synergistics, Inc. v. Microflo Ltd*., 50 F. Supp. 3d 267, 296 (E.D.N.Y. 2014) (citing *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp., LLC,* 268 F.3d 58, 63 (2d Cir. 2001)). Courts consider ten equitable factors in determining whether the first element -- domination -- is met, including:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Sentry Ins. v. Brand Mgmt. Inc*., 120 F. Supp. 3d 277, 286 (E.D.N.Y. 2015), *aff'd sub nom. Sentry Ins. a Mut. Co. v. Weber*, 720 Fed. App'x 639 (2d Cir. 2017) (citing *Liberty Synergistics*, 50 F. Supp. 3d at 296–97); *N.Y. State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014). "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a [defendant] is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Alterseekers, Inc. v. BrandForce SF, LLC*, No. 12-CV-5392, 2015 WL 5719759, at *6 (E.D.N.Y. Sept. 29, 2015) (citation omitted). If the domination requirement is met, the plaintiff must then fulfill the second requirement by showing (1) "the existence of a wrongful or unjust act toward that party," and (2) that "the act caused the party's harm." *Liberty Synergistics*, 50 F. Supp. 3d at 297 (citation omitted).

Having reviewed even the limited record presented here, the Court finds that "piercing the corporate veil" and holding the individual Defendants liable for 3-D Mgt.'s spoliation of evidence is warranted here. The deposition testimony of Michael Dunn contains sufficient evidence to support the element of control, including the fact that: (1) the Dunns intermingled funds when they would routinely infuse their own capital into 3-D Mgt. to pay for operating expenses, *see* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 145:6 to 146:17 [DE 64-1], *see also* Regan Decl., Ex. B, Joseph Dunn Dep. Tr. 43:2 to 43:17 [DE 64-2], and used 3-D Mgt. funds to pay for their personal expenses, *see* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 240:24 to 241:24, 258:10 to 264:5, 272:21 to 293:20; (2) the Dunns were seemingly both the owners and officers for 3-D Mgt., *see* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 31:4 to 32:19; (3) the Dunns shared common office space and addresses for a period of time with 3-D Mgt., *see* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 28:20 to 28:24, 29:19 to 29:24; and (4) 3-D Mgt. lacked considerable discretion, independent of the Dunns, *see* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 183:3 to 185:10. Moreover, Joseph Dunn's testimony acknowledged that the Dunns did not observe corporate formalities. *See* Regan Decl., Ex. B, Joseph Dunn Dep. Tr. 267:3 to 268:2.

With respect to the second element, Plaintiffs claim that the Dunns abused the corporate form by diverting company funds to effectively render 3-D Mgt. judgment proof. A claim that a controlling party has stripped corporate assets to render the corporation judgment proof qualifies as a "wrong" -- justifying veil-piercing. *See Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.,* 126 F. Supp. 3d 388, 404 (S.D.N.Y. 2015), *aff'd*, 716 Fed. App'x. 23 (2d Cir. 2017). Specifically, Michael Dunn's deposition testimony acknowledges the brothers' use of 3-D Mgt.'s funds to pay personal expenses which could have otherwise been used to pay Plaintiffs' judgment, and that 3-D Mgt.'s funds were also used to buy some of the properties to which the

LLC Defendants hold title.  *See* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 243:25 to 244:6,

245:2 to 245:8.  Although the record is limited here, there is sufficient evidence to "pierce the

corporate veil" for the sole purpose of holding the individual Defendants liable for 3-D Mgt.'s

spoliation of evidence.  However, a similar showing has not been made as to the remaining

corporate Defendants.

### B.     Duty to Preserve

"The first element of the traditional spoliation test," which is still applicable to tangible

evidence, "requires the moving party to demonstrate that the spoliating party had an obligation to

preserve the evidence at the time it was destroyed."  *Leidig*, 2017 WL 6512353, at *8 (citation

and quotation marks omitted).  "The obligation to preserve evidence arises when the party has

notice that the evidence is relevant to litigation or when a party should have known that the

evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436

(2d Cir. 2001); *see also Resnik v. Coulson*, No. 17-CV-0676, 2019 WL 1434051, at *7

(E.D.N.Y. Mar. 30, 2019) (quoting *Rabenstein v. Sealift, Inc*., 18 F. Supp. 3d 343, 360 (E.D.N.Y.

2014)).  "The duty to preserve ESI imposed by Rule 37(e) incorporates this longstanding

common law duty."  *Resnik*, 2019 WL 1434051, at *7 (citing Fed. R. Civ. P. 37(e) Advisory

Committee Note, 2015 Amendments).  Therefore, the Court will apply cases relevant to the

traditional spoliation test in deciding whether a duty to preserve existed at the time the tangible

evidence was destroyed.

Here, 3-D Mgt. had an obligation, at the latest, to preserve its business and financial

records once Plaintiffs commenced arbitration on June 30, 2014.  At the time the evidence was

destroyed in 2015, the arbitration had been underway for almost a year.  In opposition to the

motion, Defendants appear to argue, through the Merrihew Declaration, that an arbitration

proceeding cannot trigger an obligation to preserve and that Plaintiffs failure to "seek disclosure" of the destroyed evidence during arbitration somehow obviates any obligation that may have existed to preserve it. *See* Merrihew Decl. ¶ 9 ("Additionally, both the hard drive failure and the water destroyed documents pre-date any affirmative action, other than the then-pending arbitration in which they failed to seek any disclosure whatsoever."). This argument is unpersuasive. Not only do Defendants fail to provide any legal authority in support of their argument, but such an argument ignores the fact that "[t]he duty to preserve arises, not when litigation is certain, but rather when it is 'reasonably foreseeable.'" *Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman,* No. 13-CV-5475, 2015 WL 5027899, at *8 (E.D.N.Y. Aug. 25, 2015), *report and recommendation adopted*, 2016 WL 128154 (E.D.N.Y. Jan. 12, 2016); *see also Leidig*, 2017 WL 6512353, at *8 ("The obligation to preserve evidence arises "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.") (citing *Kronisch v. United States*, 150 F.3d 112, 126-27 (2d Cir. 1998)). Although 3-D Mgt. elected not to defend the arbitration proceeding, it could not have been surprised and did not lack notice that an arbitration award and, likely, a judgment would be entered against it. As such, 3-D Mgt. should have known that its business and financial records could be relevant to future litigation involving Plaintiffs' subsequent efforts to enforce the resulting judgment. Therefore, 3-D Mgt. was under an obligation to preserve the spoliated evidence.[3]

---

[3] Because there is no apparent dispute that this duty extended to the spoliated evidence at issue here, the Court need not address this factor.

### C.    Culpable State of Mind

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *Estate of Jackson v. Cty. of Suffolk*, No. 12-CV-1455, 2014 WL 1342957, at *11 (E.D.N.Y. Mar. 31, 2014), *adopted sub nom. Estate of Jackson ex rel. Jackson v. Cty. of Suffolk*, 2014 WL 3513403 (E.D.N.Y. July 15, 2014) (internal quotation omitted).  "In determining culpability, a case-by-case approach is preferable because failures to produce or preserve can occur 'along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'" *Wandering Dago*, 2015 WL 3453321, at *11.  "The degree of the culpability bears on the severity of sanctions." *Jalal v. Shanahan*, No. 16-CV-0281, 2017 WL 11504809, at *3 (E.D.N.Y. Dec. 1, 2017) (citing *Best Payphones*, 2016 WL 792396, at *3).  As noted, the new Rule 37(e) requires separate analyses for tangible evidence and electronic evidence.  Because Plaintiffs contend that both tangible and electronic evidence were destroyed, the Court will analyze 3-D Mgt.'s culpability as it relates to each type of evidence separately.

In the Second Circuit, with respect to tangible evidence, "the 'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly [or grossly negligently], even if without intent to breach a duty to preserve it, or negligently.'" *Best Payphones*, 2016 WL 792396, at *4 (citing *Residential Funding*, 306 F.3d at 108, 110).  "Courts in this circuit have found that the 'failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending on the circumstances, may be grossly negligent.'" *F.D.I.C. v. Horn*, No. 12-CV-5958, 2015 WL 1529824, at *10 (E.D.N.Y. Mar. 31, 2015) (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec.*, 685 F. Supp. 2d 456, 465 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. Port Auth. of New*

*York & New Jersey*, 685 F.3d 135 (2d Cir. 2012)). "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *In re Pfizer Secs. Litig.,* 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal quotations omitted). "Gross negligence has been described as a failure to exercise even that care which a careless person would use." *Official Comm.*, 2015 WL 5027899, at *9 (citation omitted).

In terms of electronic evidence, when the Advisory Committee adopted the new version of Rule 37(e), it specifically rejected the giving of adverse inference instructions on a finding of negligence or gross negligence, as the Second Circuit had permitted in *Residential Funding. See* Fed. R. Civ. P. 37(e) Advisory Committee Note, 2015 Amendment (noting that the provision "rejects cases such as [*Residential Funding*] that authorize the giving of adverse-inference instructions on a finding of negligence or gross negligence"). "Now, under Rule 37(e) (and as applied to electronic evidence only), a court may not issue an adverse inference instruction, or any harsher remedy, unless the Court finds 'that the party acted with the intent to deprive another party of the information's use in the litigation.'" *Best Payphones*, 2016 WL 792396, at *4 (quoting Fed. R. Civ. P. 37(e)(2)). Therefore, the Court may issue an adverse inference instruction with regard to the tangible evidence (*i.e.,* the physical files contained in the boxes that suffered water damage) on a finding that 3-D Mgt. acted negligently, but may not issue an adverse inference with regard to the electronic evidence (*i.e.,* the QuickBooks files) unless the Court finds that 3-D Mgt. acted with an intent to deprive Plaintiffs of that information. Additionally, Rule 37(e) only permits a Court to order curative measures or sanctions if information is "lost" because a party "failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." *Id*. (quoting Fed. R. Civ. P. 37(e)). Thus,

the Court may only order sanctions with respect to the discarded QuickBooks files upon a finding that 3-D Mgt. failed to take reasonable steps to preserve the evidence, and it cannot be restored or replaced through additional discovery.

### 1. Physical Files

Plaintiffs contend that ample circumstantial evidence exists to support the inference that the destruction of 3-D Mgt.'s physical files was, at a minimum, grossly negligent, if not intentional. Pls.' Mem. at 18-19. According to Plaintiffs, such circumstantial evidence includes, among other things: (1) 3-D Mgt.'s ostensibly intentional dissolution prior to the spoliation in an effort to avoid liability in the face of an inevitable judgment -- a tactic Plaintiffs contend was previously employed by the Dunns which led to the creation of 3-D Mgt.; (2) 3-D Mgt.'s failure to either discuss its obligations to preserve with its legal counsel or to take any steps to preserve its records prior to dissolution in light of the ongoing arbitration; (3) the storage of 3-D Mgt.'s records in such a manner that they were capable of being submerged in water by something as common as a leaky toilet; (4) the apparent lack of effort to identify or salvage the physical files once damaged or to consult with legal counsel prior to discarding the files; (5) the paucity of evidence corroborating the occurrence of any flood in 3-D Mgt.'s office, aside from the insurance claim; (6) the purported year-long scheme involving the use of 3-D Mgt.'s funds to pay for the Dunns' personal expenses and later disguising these payments as costs for materials and office supplies -- a scheme which Plaintiffs contend the physical files "likely" evidenced; and (7) Defendants' general pattern of obstructionist conduct and disregard of their discovery obligations. *Id*. at 19-20.

In opposition, Defendants contend that they lack the requisite culpable state of mind because the flood was beyond their control and the information contained in the physical files

was stored on 3-D Mgt.'s office computer and subsequently provided to the bookkeeper. Defs.'
Opp'n at 6-8; Dunn Decl. ¶¶ 12, 16-17   Specifically, Michael Dunn attests that "standing water
infiltrated virtually the entire contents of the storage boxes" and that he "never considered saving
the boxes because they were utterly ruined, and, more importantly, because all of the papers in
the boxes had already been entered into the office computer." Dunn Decl. ¶¶ 12-13. As to
Plaintiffs' suggestion that the flood did not occur, Michael Dunn states that "he has contacted the
[the company that] remediat[ed] the water damage … twice and [is] waiting on it to provide
[him] with proof of its remediation of the office." *Id*. ¶ 10.

Having reviewed the record, the Court concludes that 3-D Mgt. acted with the requisite
culpable state of mind, but did not, as Plaintiffs argue, act willfully or intentionally. The
circumstances leading up to the destruction of the physical files are suspicious and disconcerting
at best. The Dunns testified that the decision to dissolve 3-D Mgt. and create Dunn Development
was made almost two years earlier than the filing of Plaintiffs' arbitration demand, and that the
main impetus for doing so was their desire to change business models and reduce their
employees and subcontractors after Joseph Dunn was diagnosed with stomach cancer. *See*
Regan Decl., Ex. A, Michael Dunn Dep. Tr. 184:13 to 184:7, 188:2 to 188:15; Regan Decl., Ex.
B, Joseph Dunn Dep. Tr. 298:11 to 298:14. Nonetheless, Michael Dunn testified that the filing
and timing of the arbitration was "a small factor" in and "had some [impact]" on the creation
Dunn Development. Regan Decl., Ex. A, Michael Dunn Dep. Tr. 185:11 to 185:19, 187:1 to
187:18. Moreover, when deciding to dissolve 3-D Mgt. and create Dunn Development, Michael
Dunn testified that he "thought it was a possibility" that dissolving 3-D Mgt. would "get [him]
out of the defense of [Plaintiffs'] claims." Regan Decl., Ex. A, Michael Dunn Dep. Tr. 186:2 to
186:9. Joseph Dunn also testified that it was his understanding that if 3-D Mgt. dissolved, the

arbitration would essentially go away.  *See* Regan Decl., Ex. B, Joseph Dunn Dep. Tr. 300:12 to 300:16.

Previously, the Dunns owned and operated an entity referred to as 3-D Building and Home Improvement, Co. which went bankrupt prosecuting an action against a former client for nonpayment.  *See* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 7:14 to 9:20.  There, the former client's insurance carrier asserted a counterclaim against 3-D Building and Home Improvement, Co. which was defended by its insurance carrier.  *Id*.; *see also* Dunn Decl. ¶ 19.  While the circumstances and motives leading to the creation of 3-D Mgt. appear slightly distinguishable from that of Dunn Development, the record before the Court demonstrates that the Dunns possessed a level of sophistication regarding the legal implications of corporate structure which they certainly had in mind when dissolving 3-D Mgt.  Therefore, given the timing of the arbitration proceeding and dissolution of 3-D Mgt., the destruction of 3-D Mgt.'s physical files appears suspiciously coincidental at best.

Against this backdrop, and the paucity of evidence corroborating any flood in 3-D Mgt.'s office -- or the destruction of physical files resulting from that flood -- Plaintiffs urge that Michael Dunn's explanation for the destruction of records should not be credited.  Pls.' Reply at 4.  "Of course, a court is not required to credit explanations for the loss of the relevant evidence that it finds incredible."  *Moody*, 271 F. Supp. 3d at 427 (citing *Babaev v. Grossman*, 2008 WL 4185703, *3 (E.D.N.Y. 2008) (imposing sanctions for spoliation where "the court d[id] not find the defendants' arguments credible, nor their evidence persuasive, on the fundamental issue of whether they engaged in spoliation of the evidence on the ... computer")).  However, even considering the suspicious timing and circumstances of the flood, there is no hard evidence in the record to discredit Michael Dunn's sworn declaration attesting to the occurrence of the

flood and destruction of the physical files, which is largely consistent with the testimony provided at his deposition. *Compare* Dunn. Decl. ¶¶ 3-11 *with* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 106:3 to 111:16.

Nevertheless, there are factors, in addition to the suspicious timing of the destruction, supporting 3-D Mgt.'s culpability. Knowing that arbitration was proceeding against it at the time and that a judgment against it was virtually assured because of its failure to defend the arbitration, 3-D Mgt. should have taken greater care in storing the physical files containing its business records. At the very least, some effort to identify or salvage the physical files once damaged, or to consult with legal counsel prior to discarding the files should have been undertaken. Michael Dunn testified that he did not so much as "check to see … what the contents [of the boxes] were," let alone consult with legal counsel before simply discarding the physical files. Regan Decl., Ex. A, Michael Dunn Dep. Tr. 109:16-109:25, 120:21-120:24. Moreover, not even having attempted to check the contents of the boxes as openly admitted, Michael Dunn's reliance on the fact that "all of the papers in the boxes had already been entered into the office computer" as a basis to evade culpability here is unavailing. Finally, in assessing culpability, the Court cannot ignore the Defendants' demonstrated disregard for its discovery obligations in this action.

Based on the foregoing information, the Court finds that, on the "continuum of fault ranging from innocence through the degrees of negligence to intentionality" in determining a culpable state of mind, 3-D Mgt.'s conduct related to the physical files falls on the spectrum somewhere between negligence and gross negligence, closer to the latter than the former. *F.D.I.C.*, 2015 WL 1529824, at *10 (citation omitted).

## 2.    *Electronic Files*[4]

Plaintiffs contend that the factual circumstances leading up to Michael Dunn's decision to discard the hard drive, including the prior destruction of 3-D Mgt.'s physical files, provides a compelling basis for inferring that the action was done intentionally to deprive Plaintiffs of the use of the information.  Pls.' Mem at 22; Pls.' Reply at 4-6.  Plaintiffs maintain there is no dispute that Michael Dunn intentionally chose not to save 3-D Mgt.'s QuickBooks files when backing up the corporate defendants QuickBooks files prior to replacing the hard drive of 3-D Mgt.'s office computer.  *Id*.  In opposition to the motion, 3-D Mgt. contends that the information contained in the discarded QuickBooks files was produced to 3-D Mgt.'s bookkeeper and accountant and, therefore, the deletion of those files does not constitute an intent to deprive Plaintiffs of any information.  Defs.' Opp'n at 6-8.  3-D Mgt. asserts that all relevant information and records have been produced to Plaintiffs in one form or another from 3-D Mgt.'s bookkeeper and accountant.  *Id*.

An intent to deprive can be found either from a conscious act of destruction or a "conscious dereliction of a known duty to preserve electronic data."  *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018).  The intent standard is both stringent and specific:  "[T]he intent contemplated by Rule 37 is not merely the intent to perform an act that destroys ESI but

---

[4]    Plaintiffs also contend that Defendants spoliated evidence in the possession of third parties, namely, bank statements.  *See* Pls.' Mem. at 22-23.  However, Plaintiff's submissions in this regard are deficient.  Plaintiffs do not indicate which Defendants' banking statements have been spoliated, from what years the banking statements have been spoliated, and which party is specifically liable for spoliating such evidence.  From the Regan Declaration, it appears that Plaintiffs sought certain banking statements from Chase prior to June 2013 which are no longer available.  *See* Regan Decl., Ex D.  This Court notes that the time period the parties were directed to observe when responding to discovery in this case was limited to six (6) years prior to the Complaint, *i.e.*, April 3, 2012.  *See* DE 40.  Nonetheless, Plaintiffs have not sufficiently presented the facts surrounding the alleged spoliation of the referenced banking records for the Court to make any determination of this issue.

rather the intent to actually deprive another party of evidence." *Charlestown Capital Advisors,*
*LLC v. Acero Junction, Inc.,* No. 18-CV-4437, 2020 WL 5849096, at *2 (S.D.N.Y. Sept. 30,
2020) (citing *Leidig*, 2017 WL 6512353, at *11 (holding that although plaintiff intended to
"disable his websites" and delete certain email files, he did not do so for the purpose of depriving
defendants of the use of the ESI in litigation and therefore could not be sanctioned under
subsection (e)(2))). A court may infer that a party acted with an intent to deprive on the basis of
circumstantial evidence. *See, e.g.*, *CAT3*, 164 F. Supp. 3d. at 500; *Moody*, 271 F. Supp. 3d at
431-32; *Lokai Holdings*, 2018 WL 1512055, at *16. Although "[c]ourts appear to be divided
with respect to the appropriate standard of proof to apply to a claim of spoliation," the Court
finds it unnecessary to consider which to apply where, as here, the movants have supplied clear
and convincing evidence of the intent to deprive. *See Resnik*, 2019 WL 2256762, at *6 (citing
*CAT3*, 164 F. Supp. 3d. at 498-499); *Lokai Holdings*, 2018 WL 1512055, at *1 ("[G]iven the
severity of the sanctions available under Rule 37(e)(2), the requisite intent finding should be
based on clear and convincing evidence").

Here, the circumstances surrounding the spoliation of 3-D Mgt.'s electronic QuickBooks
files sufficiently constitute clear and convincing circumstantial evidence, not credibly refuted or
contested by 3-D Mgt., that the electronic files were discarded with the intent to deprive.
Michael Dunn testified that 3-D Mgt.'s office computer had been "compromised" sometime
toward the end of 2015 and needed to be replaced. Regan Decl., Ex. A, Michael Dunn Dep. Tr.
112:5 to 112:18. When he was backing up the hard drive, Michael Dunn consciously decided to
back up the QuickBooks files for each of the corporate Defendants, but excluding 3-D Mgt. *Id*.
at 112:24 to 113:4, 114:10 to 114:14. He testified that he made no attempt to seek advice from
legal counsel before deciding not to back up 3-D Mgt.'s QuickBooks files. *Id*. at 120:21 to

120:24. The only explanation provided for the destruction was that "all the information was given to [3-D Mgt.'s bookkeeper] and passed over to the accountant at that time so there was no -- I saw no need." *Id*. at 113:7 to 113:10. However, this posturing still does not explain why only 3-D Mgt.'s QuickBooks files were destroyed. Michael Dunn testified that he observed the same practices with 3-D Mgt. as he did with Dunn Development, which shared the same bookkeeper and accountant as 3-D Mgt. *Id*. at 72:3 to 72:4, 77:8 to 77:12. As such, the bookkeeper and accountant would also have ostensibly had all of the current information and data related to Dunn Development at that time. Based on Michael Dunn's logic, this would have obviated the need to backup Dunn Development's QuickBooks files as well. Yet, Michael Dunn made the decision to back up Dunn Development's QuickBooks files but not 3-D Mgt.'s QuickBooks files -- which were ultimately discarded with the hard drive. *See Lokai Holdings*, 2018 WL 1512055, at *16 ("The issue of any 'selective' deletion of emails could be telling.").

The Court recognizes that 3-D Mgt. had ceased operations when the hard drive was being backed up; however, 3-D Mgt. had not yet been formally dissolved until March 2016. Moreover, Michael Dunn was aware that Plaintiffs' arbitration proceeding against 3-D Mgt. was ongoing at the time and that a judgment against 3-D Mgt. was highly likely due to the failure to defend the arbitration. 3-D Mgt.'s QuickBooks files, which contained the core of the company's financial information and data, was not only relevant to the arbitration proceeding at the time of their destruction but arguably contained the most relevant evidence for the claims asserted against 3-D Mgt. in this action -- which itself arises from the judgment obtained in the arbitration proceeding. In light of this factor, and the fact that the bulk of 3-D Mgt.'s physical files were destroyed just months prior, the circumstantial evidence weighs heavily in support of an intent to deprive.

3-D Mgt.'s attempt to dispute any culpability and/or argue that the information was not "lost" and can "be restored or replaced through additional discovery" because its bookkeeper and accountant had the relevant "information" and "data" is also unpersuasive. *See* Defs.' Opp'n at 6-8; Dunn Decl. ¶¶ 13, 16. Indeed, the case relied upon in support of this argument -- *CAT3* -- compels the Court's rejection of that contention. In *CAT3,* the court rejected the argument that the existence of nearly identical emails constituted a substitute for deleted emails. *CAT3,* 164 F. Supp. 3d at 497. The court explained that "the fact that there are near-duplicate emails showing different addresses casts doubt on the authenticity of both.… In other words, … a different version of the same email is not an adequate substitute." *Id.* at 497. This case is distinguishable from *CAT3* in two important aspects. First, not all of the financial information and data contained in 3-D Mgt.'s QuickBooks files were provided to its bookkeeper and accountant. Second, the financial information and data reflected in the QuickBooks files which were independently created by the bookkeeper and accountant differ from that which was reflected in the discarded QuickBooks files.

Michael Dunn's testimony reveals that only a subset of data contained in 3-D Mgt.'s QuickBooks files were provided in hardcopy to the bookkeeper, who would thereafter relay that data to the accountant. He testified that he maintained the only electronic version of 3-D Mgt.'s QuickBooks files, and never provided an electronic version of these files or the data contained in them to either 3-D Mgt.'s bookkeeper or accountant. *See* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 73:9 to 73:12, 80:8 to 80:11, 81:8 to 82:7. Instead, it was his practice to print hardcopies of "checks for the weekly [] or monthly [] invoices" and other unidentified "information" from 3-D Mgt.'s QuickBooks and transmit these documents to the bookkeeper for use in preparing 3-D Mgt.'s payroll taxes and federal and state tax returns. *Id.* at 74:18 to 74:20;

77:22 to 79:5, 79:12 to 79:21. 3-D Mgt.'s bookkeeper then processed the information she received from Michael Dunn, and relayed the processed information to 3-D Mgt.'s accountant. *Id*. at 81:8 to 81:19, 83:18 to 84:8; *see also* Suppl. Regan Decl., Ex. G, Michael Dunn Dep. Tr. 298:19 to 300:19. Although Michael Dunn could not conclusively say whether the bookkeeper created and maintained her own QuickBooks files for 3-D Mgt. from the information she received, he "was pretty sure she did." Regan Decl., Ex. A, Michael Dunn Dep. Tr. at 82:17 to 83:9. To the extent that the bookkeeper or accountant created and maintained their own QuickBooks files, however, Michael Dunn acknowledged that he was not involved in that process. *Id*. at 83:18 to 84:4.

The discovery obtained by Plaintiffs from 3-D Mgt.'s bookkeeper and accountant confirmed that they did indeed create and maintain their own QuickBooks files for 3-D Mgt. from the limited information they received from Michael Dunn. *See* Suppl. Regan Decl. ¶ 13; DE 50. However, the bookkeeper no longer possesses those files -- or the documents relied upon in creating them. *See* DE 50 ¶ 4. Although the accountant produced QuickBooks records that the bookkeeper provided to him, according to Michael Dunn, these files differ from the original QuickBooks files that 3-D Mgt. maintained and discarded. For example, Michael Dunn acknowledged that unlike the records the bookkeeper and accountant maintained, 3-D Mgt.'s QuickBooks files contained the "raw information." Regan Decl., Ex. A, Michael Dunn Dep. Tr. at 83:18 to 84:4. Also, when confronted with evidence that personal expenses paid with 3-D Mgt.'s funds were mischaracterized as legitimate business expenses -- such as "materials" and "office supplies" in the QuickBooks records obtained from 3-D Mgt.'s accountant -- Michael Dunn testified that the accountant's QuickBooks records were inaccurate. *Id*. at 266:14 to 266:23; 267:10 to 268:2, 281:20 to 284:16. Dunn testified that 3-D Mgt.'s QuickBooks records

correctly characterized these transactions as payments of personal expenses. *Id*. On that basis, it is apparent that only limited information was provided from 3-D Mgt.'s QuickBooks files to the bookkeeper and accountant, and the information and data which were provided are not accurately reflected in their entirety in the QuickBooks records obtained from the accountant.

Moreover, in light of the testimony that Michael Dunn was unsure whether any QuickBooks records were created and maintained by the bookkeeper and accountant, that he was not involved in the process of creating those records if they existed, and that he could not confirm whether there were material differences between those records and the ones 3-D Mgt. discarded, it strains credibility that Michael Dunn could justify discarding 3-D Mgt.'s QuickBooks files -- months after the company's physical files were destroyed and in the midst of Plaintiffs' arbitration -- on the basis that 3-D Mgt.'s financial data and information were at one point relayed to the bookkeeper and accountant. Also telling is the fact that Michael Dunn never reached out to 3-D Mgt.'s bookkeeper or accountant to preserve whatever substitute records he may have presumed they possessed, either before or after discarding the QuickBooks files, and never contacted counsel before doing so. It is apparent that no reasonable steps were taken to preserve the evidence in the bookkeeper or accountant's possession. *See Official Comm.*, 2015 WL 5027899, at *18 ("Though the duty to preserve runs first to counsel, who has a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction, where a business … is under a duty to preserve, its corporate officers and managers have an affirmative responsibility to communicate the preservation obligation to its employees.") (internal quotations and citations omitted). Nonetheless, 3-D Mgt. "had [its] own discovery obligations, and … cannot escape them by empty speculation that some of the destroyed documents might still be recoverable from other sources." *In re Stillwater Asset*

*Backed Offshore Fund Ltd.,* No. 12-CV-14140, 2017 WL 1956848, at *5 (Bankr. S.D.N.Y. May 10, 2017) (citation omitted).  Finally, as noted, in assessing culpability, the Court cannot ignore Defendants' prior demonstrated disregard for its discovery obligations in this action.

Having completed this analysis, the Court finds that clear and convincing circumstantial evidence exists supporting the conclusion that 3-D Mgt.'s electronic QuickBooks files were spoliated with the intent to deprive.

### D.     Relevance and Prejudice

"Relevance may be assumed where the breaching party acted in bad faith or with gross negligence." *Distefano v. L. Offs. of Barbara H. Katsos, PC*, No. 11-CV-2893, 2017 WL 1968278, at *22 (E.D.N.Y. May 11, 2017) (citing *Neverson-Young v. BlackRock, Inc.*, No. 09-CV-6716, 2011 WL 3585961 at *2 (S.D.N.Y. Aug 11, 2011); *Orbit One Commc'ns., Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) (refusing to presume relevance where the evidence was merely destroyed due to the party's failure to abide by recommended preservation practices)).  However, where the spoliating party has acted only negligently, the moving party must make a showing that the lost materials were relevant.  *Id.* (citations omitted).  The Second Circuit has made "clear that relevant in th[e context of a spoliation motion] means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Id*. (citations omitted).  "It is not enough for the innocent party to show that the destroyed evidence would have been responsive to a document request." *Pension Comm. of Univ. of Montreal,* 685 F. Supp. 2d at 467.  "The innocent party must also show that the evidence would have been helpful in proving its claims or defenses – *i.e.,* that the innocent party is prejudiced without that evidence. Proof of relevance does not necessarily equal proof of prejudice." *Id*.  "No matter what level of culpability is found, ... the spoliating party should have the opportunity to

demonstrate that the innocent party has not been prejudiced by the absence of the missing information." *Id.* at 468.

"[T]he absence of prejudice can be shown by demonstrating ... that the other parties were able to obtain the same evidence from another source," or that the "evidence would not support the innocent party's claims or defenses." *Best Payphones*, 2016 WL 792396, at *6 (internal citations omitted); s*ee also Ruzhinskaya v. HealthPort Techs., LLC,* No. 14-CV-2921, 2015 WL 7308662, at *5 (S.D.N.Y. Nov. 19, 2015) ("The Court accordingly rejects [the defendant's] bid for an adverse inference instruction, because the records that [were] spoliated are, ultimately, immaterial to this litigation"); *In re Pfizer Inc. Secs. Litig.*, 288 F.R.D. at 325 (no prejudice demonstrated where scientific study sought was similar to studies that had already been produced). "Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed or unavailable evidence because doing so would subvert the purposes of the adverse inference, and would allow parties who have destroyed evidence to profit from that destruction." *Distefano*, 2017 WL 1968278, at *22 (citations omitted).

The new Rule 37(e) addresses the issue of prejudice in relation to electronic evidence. Under Rule 37(e)(1), the Court "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). However, where, as here, an intent to deprive is found, no separate showing of prejudice is required, because the "the finding of intent [to deprive] ... support[s] ... an inference that the opposing party was prejudiced by the loss of information." *Lokai*, 2018 WL 1512055, at *8 (quoting Fed. R. Civ. P. 37(e) Advisory Committee Note, 2015 Amendment).

In light of the Court's finding that 3-D Mgt.'s conduct falls somewhere between "negligent" and "grossly negligent" on the continuum with respect to the destruction of its physical files, the Court finds it necessary for Plaintiffs to make a showing that the lost materials are relevant. Contrary to Defendants' opposition, Plaintiffs have sufficiently demonstrated that both the physical and QuickBooks files contained information relevant to their claims. The physical files included "receipts, receipts from vendors, credit card receipts, statements from suppliers," Regan Decl., Ex. A, Michael Dunn Dep. Tr. 106:16 to 106:21, along with "job files" and "contracts, … specifications and then some correspondence with … clients," *id* at 117:17 to 118:7. Although not as relevant as the QuickBooks files, these documents are pertinent to Plaintiffs' successor liability claim which requires a comparison of 3-D Mgt.'s business with that of Dunn Development's business.

With respect to the QuickBooks files, there is no dispute that these contained the entirety of 3-D Mgt.'s financial and accounting records which evidence the flow of funds to and from the company and how they were accounted for. It also contained business records similar to those contained in the physical files, such as customer lists, invoicing, billing, and receipts related to work performed for clients or by subcontractors. *Id*. at 75:11 to 76:21, 135:3 to 135:21. These financial and business records are highly relevant to Plaintiffs' fraudulent conveyance claim for which they seek to hold the Dunns and the corporate Defendants liable under theories of alter ego/corporate veil piercing and successor liability.

Although the relevance of these records is apparent, the prejudice does not appear to be as significant as Plaintiffs contend. There is no doubt that the destruction of the physical and QuickBooks files "has limited the universe of documents available for [Plaintiffs] to use in this litigation." *Loaki*, 2018 WL 1512055, at *12 (citing *CAT3*, 164 F. Supp. 3d at 497 ("Plaintiff's

case against Defendants is weaker when it cannot present the overwhelming quantity of evidence it otherwise would have to support its case.")). Plaintiffs have been prejudiced by the deletion of 3-D Mgt.'s QuickBooks files because, as discussed above, the version of files produced by the accountant does not contain all of the financial information and data reflected in the discarded QuickBooks files, and, that which it does reflect, is not completely accurate. Indeed, it is apparent that Defendants intend to dispute the coding and characterizations of certain transactions in the QuickBooks files produced from the accountant. Notwithstanding these transactions, the production of the accountant's QuickBooks files mitigates the prejudice suffered by Plaintiffs. The record also demonstrates that Plaintiffs have obtained considerable discovery from alternative sources. For instance, Plaintiffs have obtained banking records, credit card statements, leases, pamphlets, marketing documents, and certain customer and project specific information to name a few. *See* Regan Decl., Ex. A, Michael Dunn Dep. Tr. 219:19 to 219:25, 220:3 to 220:25, 255:2 to 255:16, 272:16 to 273:25, 370:2 to 370:16, 396:14 to 396:19. The QuickBooks files for the remaining corporate Defendants which presumably evidence transactions with 3-D Mgt., among other things, also exist. In fact, based on the evidence obtained from alternative sources, Plaintiffs admit that they "have secured significant admissions in the [Defendants'] deposition testimony." Pls.' Mem. at 26. Having reviewed the record, it appears that Plaintiffs are in possession of some compelling evidence in support of their claims. Consequently, any prejudice Plaintiffs appear to have suffered has been mitigated to a certain extent, and is not as significant as Plaintiffs assert. Nevertheless, the economic prejudice suffered by Plaintiffs in having to piece together information from other sources to recover relevant documents remains.

Based on the foregoing factors, the Court finds that Plaintiffs have demonstrated an entitlement to sanctions for spoliation, but that the severity of the sanctions to be imposed are limited.

### E.     Appropriate Sanctions

A district court has wide latitude in its decision-making with respect to the imposition of sanctions "whether exercising its inherent power, or acting pursuant to Rule 37." *Official Comm.,* 2015 WL 5027899, at *21 (collecting cases). "When contemplating what level of sanctions is [] appropriate, a court should be guided by the entire record that exists." *Id*. (citations omitted). "When reviewing the record, a court should weigh the following factors: (a) willfulness or bad faith on the part of the noncompliant party; (b) the history, if any, of non-compliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Id*. (citing *Am. Cash Card Corp., v. AT & T Corp.,* 184 F.R.D. 521, 524 (S.D.N.Y. 1999)). "[T]he applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Id*. (citing *West*, 167 F.3d at 779.

"In addition to outright dismissal, many other sanctions, such as an adverse jury inference and additional discovery, are available to remedy acts of spoliation." *Official Comm.,* 2015 WL 5027899, at *21 (citations omitted). Generally, a court will not impose the draconian sanction of dismissal or default judgment unless the acts were extreme -- and then, only after consideration of alternative, less drastic remedies. *Id*.; *see also Lokai*, 2018 WL 1512055, at *8 ("Dismissal and the entry of a default judgment are even more 'drastic remed[ies],' most typically considered in the context of 'extreme circumstances' warranting sanctions under Rule 37(b), where the non-

moving party has 'fail[ed] to comply with the court's discovery orders willfully, in bad faith, or through fault.'"). The sanction of a default judgment should not be imposed lightly, especially in cases where alternative remedies are sufficient to address the spoliation. *Id.* (citing *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya,* 248 F.R.D. 126, 145 (S.D.N.Y. 2007)). Even a sanction in the form of an adverse inference instruction is still "an extreme sanction and should not be imposed lightly." *F.D.I.C.*, 2015 WL 1529824, at *3 (citing *Treppel v. Biovail Corp.*, 249 F.R.D. 111, 120 (S.D.N.Y. 2008)); *see also Lokai*, 2018 WL 1512055, at *8 ("An adverse-inference instruction that missing evidence may or should be presumed to be unfavorable to the party who destroyed the evidence has long been considered an 'extreme' sanction that 'should not be given lightly.'") (citation omitted); *Zubulake IV,* 220 F.R.D. at 219 ("In practice, an adverse inference instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome.").

Where, as here, 3-D Mgt. acted with an intent to deprive Plaintiffs of information with respect to the electronic QuickBooks files, new Rule 37(e)(2) permits the imposition of severe sanctions. However, "a finding of intent does not *require* a court to impose the sanctions listed under [37](e)(2)." Fed. R. Civ. P. 37(e) Advisory Committee Note, 2015 Amendment (emphasis added). In general, a court should impose the "least harsh sanction that can provide an adequate remedy." *Tchatat*, 2017 WL 1379097, at *4.

With the above principles and current circumstances in mind, the Court has carefully considered Plaintiffs' request for more severe sanctions, namely, the entry of default judgment in Plaintiffs' favor, precluding the introduction of any evidence relevant to the subject matter of the spoliated evidence, deeming certain facts admitted, and an adverse inference instruction. Pls.' Mem. at 26-30. A default judgment is not appropriate in these circumstances because the

prejudice has been mitigated to a certain extent, and "this is also not a case where Defendants have failed to comply with multiple discovery orders of this Court, have failed to heed prior lesser sanctions that have been levied or have disregarded prior warnings that continued noncompliance would result in a default judgment." *Official Comm.,* 2015 WL 5027899, at *22. Although Defendants were sanctioned once for their failure to comply with a discovery order, "[s]tanding alone, a single pretrial violation ... would not ordinarily result in an imposition of a sanction of such finality as ... entering a judgment by default." *Id.* (citing *Microsoft Corp. v. Computer Care Ctr., Inc.,* No. 06-CV-1429, 2008 WL 4179653, at *4 (E.D.N.Y. Sept. 10, 2008)); *see also Rahman v. Red Chili Indian Cafe, Inc.,* No. 17-CV-5156, 2021 WL 50877, at *6 (S.D.N.Y. Jan. 6, 2021) ("[A] single pretrial violation, such as [a] party's failure to respond to a document request by the date ordered, would not ordinarily result in an imposition of a sanction of such finality as striking defendants' answer and entering judgment by default.") (citing *U.S. Freight Co. v. Penn Cent. Transp. Co.,* 716 F.2d 954, 954 (2d Cir. 1983)). The broad preclusion order which Plaintiffs request is also overly harsh since "it would potentially preclude testimony and other evidence wholly unaffected [or mitigated] by the spoliation underlying [the instant] motion, and thus would … [go] beyond the degree needed to cure the prejudice flowing from that misconduct." *Charlestown Capital Advisors*, 2020 WL 5849096, at *17. Moreover, deeming those facts identified by the Plaintiffs as admitted is not reasonable because doing so would have the practical effect of entering a default judgment on Plaintiffs' claims for alter ego/corporate veil piercing and successor liability, which the Court has already found to be inappropriate under the circumstances.

Instead, in the exercise of its discretion, the Court finds that monetary sanctions are appropriate and directs 3-D Mgt. and the Dunns to reimburse Plaintiffs for the attorneys' fees

and costs they have incurred in: (1) having to seek relief from the Court with respect to discovery not initially provided in response to Plaintiffs' discovery requests; (2) for subpoenas on third parties necessitated by Defendants' actions; and (3) bringing the instant motion for sanctions. *See Best Payphones*, 2016 WL 792396, at *7 ("The Court has discretion to award attorneys' fees and costs in connection with spoliation motions to punish the offending party for its actions and deter the litigant's conduct, sending the message that egregious conduct will not be tolerated.") (internal quotations and citation omitted); *Fashion Exch. LLC,* 2019 WL 6838672, at *7 ("[M]onetary sanctions are the appropriate remedy in this case to compensate Defendants for the time and resources spent by Plaintiff's dragging out this issue."); *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 52-53 (S.D.N.Y. 2010) ("Costs, including attorney's fees are appropriate when a defendant has unjustifiably destroyed evidence that it was under a duty to preserve, 'causing the plaintiff to expend time and effort in attempting to track down the relevant information' "). "This remedy ameliorates the economic prejudice imposed" on Plaintiffs "and also serves as a deterrent to future spoliation." *CAT3*, 164 F. Supp. 3d at 502. Plaintiffs' counsel is directed to provide Defendants' counsel with a breakdown of those fees and costs, and, if 3-D Mgt. and the Dunns are unable to agree as to the amounts incurred, the parties shall contact Chambers (631-712-5760) within 30 days of this Order to schedule a conference to address the dispute.

Second, pursuant to Rule 37(e)(1), the parties shall be precluded from offering testimony at trial regarding the coding and characterization of transactions in the discarded 3-D Mgt.'s QuickBooks files which contradict those in the produced QuickBooks files, including any testimony suggesting that certain transactions were properly coded in 3-D Mgt.'s QuickBooks as personal expenses. *See id.*, at 500, 502 (even where the moving party had demonstrated an intent to deprive, finding that an order precluding the non-moving party from relying on "their version

of the emails at issue" was appropriate, as it was "no more severe than [was] necessary to cure the prejudice to the [moving party]").

Finally, if Plaintiffs are able to make a *specific* showing that there are material gaps in the records it has been able to obtain regarding *specific* business records or financial transactions, and those gaps are the result of Defendants' deletion of 3-D Mgt.'s QuickBooks files, then, in advance of trial of this action, Plaintiffs may request from the District Judge (before whom this case will be tried) permission to make a motion seeking an adverse inference instruction as to those matters.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for sanctions is GRANTED, in part, and DENIED, in part, in accordance with the findings in this Memorandum and Order.

**SO ORDERED.**

Dated: Central Islip, New York
July 2, 2021

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
United States Magistrate Judge